IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. 11-00097-WS |
| | * | 207-CG |
| CHELSIE DANIELLE FRENCH | * | |

### PLEA AGREEMENT

The defendant, **CHELSIE DANIELLE FRENCH**, represented by her counsel, and the

United States of America have reached a plea agreement in this case, pursuant to Rule 11 of the

Federal Rules of Criminal Procedure, the terms and conditions of which are as follows:

### RIGHTS OF THE DEFENDANT

1.  The defendant understands her rights as follows:

    a.  To be represented by an attorney;

    b.  To plead not guilty;

    c.  To have a trial by an impartial jury;

    d.  To confront and cross-examine witnesses and to call witnesses and

    produce other evidence in her defense; and

    e.  To not be compelled to incriminate herself.

### WAIVER OF RIGHTS AND PLEA OF GUILTY

2.  The defendant waives rights b through e, listed above, and pleads guilty to Count

    1 of the Indictment, charging a violation of Title 21, United States Code, Section

    846, conspiracy to distribute methamphetamine.

3.  The defendant understands that the statements she makes under oath in the plea of



guilty must be completely truthful and that she can be prosecuted for making false

statements or perjury, or receive a perjury enhancement at sentencing, for any

false statements she makes intentionally in this plea of guilty.

4.    The defendant expects the Court to rely upon her statements here and her response

to any questions that she may be asked during the guilty plea hearing.

5.    The defendant is not under the influence of alcohol, drugs, or narcotics.  She is

certain that she is in full possession of her senses and is mentally competent to

understand this Plea Agreement and the guilty plea hearing which will follow.

6.    The defendant has had the benefit of legal counsel in negotiating this Plea

Agreement.  She has discussed the facts of the case with her attorney, and her

attorney has explained to the defendant the essential legal elements of the criminal

charge which has been brought against her.  The defendant's attorney has also

explained to the defendant her understanding of the United States' evidence and

the law as it relates to the facts of her offense.

7.    The defendant understands that the United States has the burden of proving each

of the legal elements of the criminal charge beyond a reasonable doubt.  The

defendant and her counsel have discussed possible defenses to the charge.  The

defendant believes that her attorney has represented her faithfully, skillfully, and

diligently, and she is completely satisfied with the legal advice of her attorney.

8.    A separate document, entitled Factual Resume, will be submitted to the Court as

evidence at the guilty plea hearing.  The Factual Resume is incorporated by

reference into this Plea Agreement.  The defendant and the United States agree

that the Factual Resume is true and correct. Alterations to the Plea Agreement or Factual Resume initialed only by the defendant and her counsel are not part of this agreement and are not agreed to by the United States.

9.    This plea of guilty is freely and voluntarily made and is not the result of force, threats, promises, or representations, apart from those representations set forth in this Plea Agreement. There have been no promises from anyone as to the particular sentence that the Court will impose. The defendant is pleading guilty because she is guilty.

10.   The defendant also knowingly and voluntarily waives all rights, whether asserted directly or through a representative, to receive from the United States after sentencing any further records, reports, or documents pertaining to the investigation or prosecution of this matter. This waiver includes, but is not limited to, rights under the Freedom of Information Act and the Privacy Act of 1974.

## PENALTY

11.   The maximum penalty the Court could impose as to Count 1of the Indictment is

    a.    5 years mandatory minimum to a maximum of 40 years imprisonment;

    b.    A fine not to exceed $ 5,000,000.00;

    c.    A term of supervised release of 5 years, which would follow any term of imprisonment. If the defendant violates the conditions of supervised release, she could be imprisoned for the entire term of supervised release; and

    d.    A mandatory special assessment of $100.00.

## SENTENCING

12.   The Court will impose the sentence in this case. The United States Sentencing Guidelines are advisory and do not bind the Court. The defendant has reviewed the application of the Guidelines with her attorney and understands that no one can predict with certainty what the sentencing range will be in this case until after a pre-sentence investigation has been completed and the Court has ruled on the results of that investigation. The defendant understands that at sentencing, the Court may not necessarily sentence the defendant in accordance with the Guidelines. The defendant understands that she will not be allowed to withdraw her guilty plea if the advisory guideline range is higher than expected, or if the Court departs or varies from the advisory guideline range.

13.   The defendant understands that this Plea Agreement does not create any right to be sentenced in accordance with the Sentencing Guidelines, or below or within any particular guideline range, and fully understands that determination of the sentencing range or guideline level, or the actual sentence imposed, is solely the discretion of the Court.

14.   The United States will provide all relevant sentencing information to the Probation Office for purposes of the pre-sentence investigation. Relevant sentencing information includes, but is not limited to, all facts and circumstances of this case and information concerning the defendant's conduct and background.

15.   Both the defendant and the United States are free to allocute fully at the time of sentencing.

4

16.     The defendant agrees to tender $100.00 to the U.S. District Court Clerk in satisfaction of the mandatory special assessment in this case. The United States reserves the right to withdraw any favorable recommendations it may agree to within this document if the defendant fails to pay the special assessment prior to or at the time of her sentencing.

### UNITED STATES' OBLIGATIONS

17.     The United States will not bring any additional charges against the defendant related to the facts underlying the Indictment and will move to dismiss all remaining counts once sentence is imposed. This agreement is limited to the United States Attorney's Office for the Southern District of Alabama and does not bind any other federal, state, or local prosecuting authorities.

18.     The United States will recommend to the Court that the defendant be sentenced at the low end of the advisory sentencing guideline range as determined by the Court.

### APPLICATION OF U.S.S.G. § 5K1.1 AND/OR FED.R.CRIM.P. 35

19.     The defendant understands and agrees that she has no right to cooperate, and that the decision whether to allow her to cooperate is reserved solely to the United States in the exercise of its discretion. If the United States agrees to allow the defendant to cooperate, and if the defendant agrees to cooperate, the following terms and conditions apply:

    a.     The defendant shall fully, completely, and truthfully respond to all questions put to her by law enforcement authorities regarding the

5

underlying facts of the offense(s) with which she is charged, as well as the underlying facts of any criminal offense(s), state or federal, of which she has information or knowledge.

b.    The defendant acknowledges that she understands that she shall provide truthful and complete information regarding any offense about which she has knowledge or information regardless of whether law enforcement authorities question her specifically about any such offense. This provision requires the defendant to divulge all information available to her even when law enforcement authorities do not know about the defendant's involvement, knowledge or information relating to any particular offense. This requirement extends to any and all persons about whom the defendant has such knowledge or information.

c.    The defendant agrees to cooperate completely with all law enforcement authorities in any matters to which her cooperation may be deemed relevant by any law enforcement authority. The defendant agrees to fully comply with all instructions from law enforcement authorities regarding the specific assistance she shall provide. This includes, but is not limited to, consenting to monitored and/or recorded telephone conversations, participating in undercover operations, testifying completely and truthfully before any grand jury, at any pre-trial proceeding, during any trial, and any post-trial proceeding.

d.    If the United States deems it necessary, the defendant may be required to

6

take a polygraph examination(s) which will be administered by a government polygrapher. The defendant agrees that the results of any polygraph examination may be used by the United States in its evaluation of whether there has been substantial assistance, and are admissible at sentencing to rebut an assertion by the defendant of bad faith or unconstitutional motive on the part of the United States.

e.     The defendant agrees to turn over to the United States any and all documents, tapes and other tangible objects which are in her possession or under her control and which are relevant to her participation in and knowledge of criminal activities, regardless of whether it relates to the charged offense. This obligation is a continuing one and includes materials that the defendant may acquire, obtain or have access to after the execution of this agreement.

f.     The defendant also agrees to identify the assets of any other person which were obtained through or facilitated the defendant's illegal activities or the illegal activities of another.

g.     If the defendant provides full, complete, truthful and substantial cooperation to the United States, which results in substantial assistance to the United States in the investigation or prosecution of another criminal offense, a decision specifically reserved by the United States in the exercise of its sole discretion, then the United States agrees to move for a downward departure in accordance with Section 5K1.1 of the United

States Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal

Procedure, whichever the United States deems applicable. The United

States specifically reserves the right to make the decision relating to the

extent of any such departure request made under this agreement based

upon its evaluation of the nature and extent of the defendant's cooperation.

The defendant understands that the United States will make no

representation or promise with regard to the exact amount of reduction, if

any, the United States might make in the event that it determines that the

defendant has provided substantial assistance. The defendant understands

that a mere interview with law enforcement authorities does not constitute

substantial assistance. The defendant also understands that, should she

provide untruthful information to the United States at any time, or fail to

disclose material facts to the United States at any time, or commits a new

criminal offense, the United States will not make a motion for downward

departure. If the defendant's effort to cooperate with the United States

does not amount to substantial assistance as determined solely by the

United States, the United States agrees to recommend that the defendant

receive a sentence at the low end of the advisory guideline range.

h.    The United States and the defendant agree that any breach of this

agreement by the defendant, including but not limited to committing a new

offense, failing to cooperate, intentionally withholding information, giving

false information, committing perjury, failing to identify assets obtained

by her from her illegal activities or obtained by others associated with her

or of which she has knowledge, refusing to take a polygraph examination,

failing a polygraph examination, or refusing to testify before the grand jury

or at any judicial proceeding, would:

(1)     permit the United States to reinstate and proceed with prosecution

        on any other charges arising from the matters underlying the

        Indictment; and

(2)     permit the United States to initiate and proceed with the

        prosecution on any other charges arising from a breach of this

        agreement.  The United States will not be limited, in any respect, in

        the use it may make against the defendant of any information

        provided by the defendant during her breached cooperation.  Such

        breach will constitute a waiver of any claim the defendant could

        make under the United States Constitution, the Federal Rules of

        Evidence, the Federal Rules of Criminal Procedure, or any statute

        or case law by which the defendant seeks to suppress the use of

        such information or any evidence derived from such information.

i.      Nothing in this agreement shall protect the defendant in any way from

        prosecution for any offense committed after the date of this agreement,

        including perjury, false declaration, false statement, and obstruction of

        justice, should the defendant commit any of these offenses during her

        cooperation.  The defendant acknowledges and agrees that the information

that she discloses to the United States pursuant to this agreement may be used against her in any such prosecution.

j. The United States and the defendant agree that the defendant will continue her cooperation even after she is sentenced in the instant matter. her failure to continue her cooperation will constitute a breach of this agreement, and the defendant agrees that under such conditions, the United States will be free to reinstate the charges and the prosecution of the charges in the Indictment, which are to be dismissed in accordance with this agreement. Under these circumstances, the defendant expressly waives any rights she may have under the statute of limitations and the speedy trial provisions.

## LIMITED WAIVER OF RIGHT TO APPEAL AND WAIVER OF COLLATERAL ATTACK

20. As part of the bargained-for exchange represented in this plea agreement, and subject to the limited exceptions below, the defendant knowingly and voluntarily waives the right to file any direct appeal or any collateral attack, including a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255. Accordingly, the defendant will not challenge her guilty plea, conviction, or sentence (including a sentence imposed on revocation of probation or supervised release) in any district court or appellate court proceedings.

a. **EXCEPTIONS.** The defendant reserves the right to timely file a direct appeal challenging:

(1)     any sentence imposed in excess of the statutory maximum;

(2)     any sentence which constitutes an upward departure or variance from the advisory guideline range.

21.     If the United States files a notice of appeal and such appeal is authorized by the Solicitor General, the defendant is released from the appellate waiver.

22.     The defendant further reserves the right to timely move the district court for an amended sentence under 18 U.S.C. § 3582 in the event of a future retroactive amendment to the Sentencing Guidelines which would affect the sentence.

23.     If the defendant receives a sentence within or below the advisory guideline range, this plea agreement shall serve as the defendant's express directive to defense counsel to timely file a "Notice of Non-Appeal" following sentencing, signed by the defendant.

## VIOLATION OF AGREEMENT

24.     The defendant understands that if she breaches any provision of this Plea Agreement, the United States will be free from any obligations imposed by this agreement, but all provisions of the agreement remain enforceable against the defendant. In the exercise of its discretion, the United States will be free to prosecute the defendant on any charges of which it has knowledge. In such event, the defendant agrees not to assert any objections to prosecution that she might have under the Sixth Amendment and/or Speedy Trial Act.

25.     In addition, if the defendant is released from detention prior to sentencing, she understands that the United States will no longer be bound by this agreement if

she violates any condition of her release prior to sentencing or prior to serving her sentence after it is imposed.

### ENTIRETY OF AGREEMENT

26.    This document is the complete statement of the agreement between the defendant and the United States and may not be altered unless done so in writing and signed by all the parties.

Respectfully submitted,

KENYEN R. BROWN
UNITED STATES ATTORNEY

Date: 10/4/11

GEORGE F. MAY
Assistant United States Attorney

I have consulted with my counsel and fully understand all my rights with respect to the offense charged in the Indictment pending against me. I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand this agreement, and I voluntarily agree to it. I hereby stipulate that the Factual Resume, incorporated herein, is true and accurate in every respect, and that had the matter proceeded to trial, the United States could have proved the same beyond a reasonable doubt.

Date: Oct. 13, 11

CHELSIE DANIELLE FRENCH
Defendant

12

I am the attorney for the defendant. I have fully explained her rights to her with respect to the offense(s) charged in the Indictment in this matter. I have carefully reviewed every part of this Plea Agreement with her. To my knowledge, her decision to enter into this agreement is an informed and voluntary one. I have carefully reviewed the Factual Resume, incorporated herein, with the defendant and to my knowledge, her decision to stipulate to the facts is an informed, intelligent and voluntary one.

Date: _10·13·11_

_____
JAMES M. BYRD
Defense Counsel

1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO.  11-00097-WS |
| | * | |
| CHELSIE DANIELLE FRENCH | * | |

## FACTUAL RESUME

The defendant, **CHELSIE DANIELLE FRENCH**, admits the allegations of Count 1 of the Indictment.

## ELEMENTS OF THE OFFENSE

**FRENCH** understands that in order to prove a violation of Title 21, United States Code, Section 846, as charged in Count 1 of the Indictment, the United States must prove:

First:     That two or more persons in some way or manner, came to a mutual understanding to conspire to distribute methamphetamine; and

Second:     That the defendant knowingly and willfully became a member of such conspiracy.

## OFFENSE CONDUCT

Defendant, **CHELSIE DANIELLE FRENCH**, admits in open court and under oath that the following statement is true and correct and constitutes evidence in this case.  This statement of facts is provided solely to assist the Court in determining whether a factual basis exists for **CHELSIE DANIELLE FRENCH's** plea of guilty.  The statement of facts does not contain each and every fact known to **CHELSIE DANIELLE FRENCH** and to the United States concerning the defendant's involvement in the charges set forth in the plea agreement.

In 2007 SA-350-MO a reliable and credible confidential informant, contacted the HSI

1

office in Mobile, Alabama regarding a Richard Nunez. SA-350-MO provided information that

Nunez was selling large amounts of methamphetamine and firearms to the illegal immigrants in

the Mobile area. Based on this information and the safety of SA-350-MO, HSI utilized another

confidential source, SA-352-MO, to infiltrate the organization.

On October 3, 2007, at approximately 11:50 am HSI agents covered a meeting between

SA-352-MO and Richard NUNEZ at the Dream Land BB-Q restaurant located on Hwy 65 in

Mobile, Alabama. NUNEZ arrived driving a white Nissan pathfinder with Alabama plates.

SS/A Soto and SS/A Barr were inside the BB-Q restaurant and relayed to outside surveillance

units at approximately 11:51 when NUNEZ sat down for lunch with SA-352-MO.

S/A Fermo and SS/A Soto debriefed SA-352-MO regarding the meeting that had

transpired. SA-352-MO stated that NUNEZ stated that he was connected to a major

cocaine/methamphetamine smuggling organization. NUNEZ stated that the organization

smuggles narcotics into the United States from the Republic of Mexico. Once in the United

States the narcotics are smuggled to Atlanta, Georgia. SA-352-MO stated that NUNEZ had

informed him/her that a large shipment of cocaine was scheduled to arrive in the next week.

NUNEZ stated that the organization would be bringing the shipment through Mobile, Alabama

and that he, NUNEZ, could provide SA-352-MO at least 50 kilograms of cocaine for a price of

around $18,000.00 per kilogram. SA-352-MO stated that the conversation consisted of prices

and smuggling methods.

In February 2011, HSI ASAC Mobile, Alabama received information from the Mobile

County Sheriff's Department regarding the Richard NUNEZ and several other operating a large

scale loosely affiliated methamphetamine organization in the Mobile area. On 3/15/2011, HSI

Special Agent (S/A) Fermo, Agent Pena and Deputy Busby interviewed Samantha Joe Johnson regarding her involvement in a large scale methamphetamine smuggling and distribution ring.

S/A Fermo asked JOHNSON about **Chelsie FRENCH**. JOHNSON stated that **FRENCH** and C.K are both drug users and drug sellers. JOHNSON stated that back in 2010 she purchased about a half a gram of methamphetamine from **FRENCH**. JOHNSON stated she did not know his name but the methamphetamine **FRENCH** had came from a Mexican guy. (Later identified through the course of this investigation as Richard NUNEZ. S/A Fermo showed JOHNSON a photo chart and JOHNSON identified FRENCH and C. K..

On March 15, 2011, HSI Special Agent (S/A) Fermo, Agent Pena and Deputy Busby interviewed Jorge VARGAS in the presence of his lawyer. S/A Pena asked VARGAS to describe what he, VARGAS, knows about Richard NUNEZ. VARGAS stated that **NUNEZ** sells methamphetamine in the Mobile area and that the drugs he, VARGAS, was arrested with by the Sheriffs department in December 2010 came from **NUNEZ**. VARGAS stated that **NUNEZ** drives to Atlanta to pick-up the narcotics from a Mexican drug smuggling organization. S/A Fermo asked VARGAS the source of the drugs and VARGAS stated that he did not know but knows the drugs come from Mexico to Atlanta and then to Mobile, Alabama. VARGAS stated that NUNEZ goes to Atlanta about every 2-3 weeks and picks up a shipment of drugs. VARGAS stated that when NUNEZ goes he takes a load vehicle and has a white female drive for him. NUNEZ then follows behind the vehicle to make sure the drugs arrive back in Mobile, Alabama. VARGAS stated that the female that furnishes the vehicle is Alicia.

S/A Fermo asked VARGAS if NUNEZ had a girlfriend. VARGAS stated that NUNEZ'S girlfriend is a girl named **FRENCH** and has a good friend she always runs around with. S/A

3

Fermo showed VARGAS a picture of several people and VARGAS identified **Chelsie FRENCH**

as NUNEZ' girlfriend and C.K as **FRENCH'S** friend. VARGAS stated that both **FRENCH** and

C.K. use and sell drugs supplied by NUNEZ.

VARGAS stated that **NUNEZ** sells drugs to a bunch of white guys, but he does not know

who they are. S/A Fermo showed VARGAS several photos but VARGAS could not positively

identify the subjects. VARGAS stated that NUNEZ is very careful in his drug dealings. S/A

Fermo asked VARGAS to describe how the white people that NUNEZ is selling to and the

Mexicans interact. VARGAS stated that they all sell and use drugs together. They have all been

introduced to each other through different contacts and all run in the same circles.

S/A Fermo asked VARGAS as to where NUNEZ stores his narcotics. VARGAS stated that

NUNEZ stores the narcotics in his residence but did not know where he hides it. VARGAS

described an incident where he arrived at NUNEZ' house and NUNEZ already had the drugs out

on the table. VARGAS stated the most methamphetamine he had ever seen at one time was

around 2-3 ounces.

On May 11, 2011 information was received from CS1 that the NUNEZ just returned

from Mexico with a large shipment of "ice". S/A Fermo conducted record checks in the

Homeland Security data base known as (TECS) and found that NUNEZ had recently returned to

the U.S. from Mexico. On this date, at approximately 10:30 am, surveillance was established at

Howard CHESTANG'S residence located at 7419 Gaynor Road Eight Mile, Alabama 36613.

Deputy Givens observed a red car (registered to Richard NUNEZ) a truck (registered to NUNEZ)

and a white SUV owned by **Chelsie FRENCH**. Deputy Givens observed CHESTANG,

**FRENCH** and another male later identified as NUNEZ in the rear of the residence.

4

CHESTANG was observed walking around the house with a gun in his hand and goes over near the shed and appears to dig a black box out of the ground and remove what appeared to be a black sock from the box. CHESTANG then entered the shed and joined **FRENCH** and NUNEZ.

At approximately 12:50 pm S/A Fermo, S/A Green, Deputy O'shea and Deputy Hill used a confidential source, hereinafter referred to as CS1, to place a recorded controlled call to Howard CHESTANG at phone number 251-288-XXXX. CS1 advised CHESTANG that he/she was with his/her cousin (Confidential source # 2, hereinafter referred to as CS2) and was ready to get the narcotics. CHESTANG advised CS1 that he, CHESTANG, had the narcotics at the house that morning around 9:30am but that the narcotics were gone. CHESTANG indicated that he would call about getting it again and call CS1 back.

At approximately 1:06 pm, CHESTANG called CS1 and stated that he was going to get the narcotics. This conversation was recorded by officers for evidence purposes. Subpoenaed phone toll records show that at 13:03 CHESTANG called NUNEZ'S cell phone. Following CHESTANG speaking with NUNEZ, CHESTANG then calls CS1'S cellular phone. The phone tolls are consistent with that of the recorded conversation, where CHESTANG indicates to CS1 that he is going to get the narcotics. Surveillance units observed CHESTANG depart his residence of 7419 Gaynor Road Eight Mile, Alabama 36613 and travel to NUNEZ'S residence of 11730 Glenwood Circle Semmes, Alabama 36575 in the red car with a Alabama license plate registered to NUNEZ. Surveillance units follow CHESTANG to NUNEZ'S residence where the second surveillance unit sitting on NUNEZ'S residence observed CHESTANG arrive and go to the rear of the trailer and then walk back around to the front of the trailer. CHESTANG retrieved the methamphetamine from his supplier, NUNEZ. A short time later CHESTANG is observed

5

leaving the residence in a S-10 truck(License Plate # 2B92P26) which came back registered to Richard Gaona NUNEZ at 11730 Glenwood Circle Semmes, Alabama 36575, which has been identified as another one of NUNEZ' vehicle.

At approximately 2:30 CHESTANG arrived back at his residence and calls CS1 and indicates that he has returned. At approximately 2:42 pm CS1 and CS2 arrive at CHESTANG'S residence and officers observe them enter the garage area. CS2 met with CHESTANG and provided him $1,600.00 in marked U.S. currency (in addition the money was videotaped for identification purposes) CHESTANG pulled out the narcotics from under the hood of NUNEZ'S vehicle and retrieved (1) one ounce of "ice" a pure form methamphetamine. CHESTANG weighs out the narcotics and provides it to CS2. CS2 is wired with both video and audio recording devices for evidence purposes. At approximately 2:48 pm, CS1 and CS2 departed the location and meet with officers to hand over the video evidence and narcotics purchased from the organization.

At approximately 3:25 pm CHESTANG departed his residence of 7419 Gaynor Road Eight Mile, Alabama 36613 driving NUNEZ'S vehicle and pulling a trailer. Surveillance units observe CHESTANG on his cellular phone. At approximately 3:30 pm Deputy O'Shea orders a marked patrol car to conduct a traffic stop on CHESTANG and found inside the truck is the federal governments marked $1,600.00 provided by CS2. CHESTANG was taken in to custody and later charged on state charges. Subpoenaed phone tolls show that at 4:45 pm NUNEZ makes an attempted call to CHESTANG'S phone.

At approximately 4:50 pm, Deputy Givens observed a White SUV arrive at CHESTANG'S being driven by **FRENCH**. **FRENCH** pulls out of the residence and Deputies

6

observes **FRENCH** spot surveillance units and speed away. Phone tolls show **FRENCH'S** cell

phone making (2) two back to back calls to CHESTANG at 4:55 pm and 4:56 pm. From 4:46 pm

to 4:54 pm **FRENCH** calls NUNEZ'S cell phone approximately (4) times. Officers stopped

FRENCH'S vehicle and recovered her cell phone. In the phone are several text messages from

NUNEZ to **FRENCH**. The Messages are as follows:

4:25 pm: **FRENCH** texts NUNEZ: "I am not quite ready to eat yet but I need to talk to   you"

4:38 pm: NUNEZ texts **FRENCH**: "Hey is ok"

4:40 pm: **FRENCH** texts NUNEZ: "ok"

4:42 pm: NUNEZ texts **FRENCH**: "Yea theres nothing wrong right?"

      **French** is transported to NUNEZ'S residence of 11730 Glenwood Circle Semmes,

Alabama 36575, where officers were executing a state search warrant. S/A Fermo and Deputy

Legire provided **FRENCH** a Miranda Form and asked did she understand the form. S/A Fermo

read over the rights section to **FRENCH** advising her of the rights to have an attorney present

during questions and that any statements she made could be used against her. **FRENCH** read

over the form and signed the form and agreed to cooperate.

      **FRENCH** stated she understood her rights and agreed to provide all her information on

NUNEZ and his methods of operation. S/A Fermo asked **FRENCH** to describe her role with

NUNEZ. **FRENCH** stated that he is her boyfriend and she, **FRENCH**, distributes crystal meth

for him. S/A Fermo asked **FRENCH** if she knew where the drugs came from. **FRENCH** stated

that he meets with other Mexicans and these "Mexicans mainstream from Mexico to Georgia".

**FRENCH** stated that she has been to Georgia on (2) two occasions with NUNEZ and on one of

the occasions NUNEZ had someone bring the drugs back to Mobile for him. S/A Fermo asked

what is the largest amount of methamphetamine she had seen in NUNEZ'S possession? **FRENCH** indicated that she has seen 200 grams of "ice". **FRENCH** indicated that he, NUNEZ, slowed down in his distribution since she, **FRENCH**, was arrested in the front yard of NUNEZ'S house in possession of "ice" by the Mobile County Sheriff's department. This statement was verified by Deputy Busby who advised agents that in September 2010, Deputies responded to a call by a patrol officer involving a traffic stop on **FRENCH'S** vehicle. This incident occurred in the front of NUNEZ'S residence of 11730 Glenwood Circle Semmes, Alabama 36575. As officers spoke with **FRENCH** they determined that she was being deceptive and that narcotics maybe present in the car. Deputies ran a K-9 on the vehicle, at which time **FRENCH** informed officers she would show them where the narcotics were stored. Deputies recovered a half a gram of "ice" from **FRENCH'S** vehicle. S/A Fermo asked to describe all the people that distribute for NUNEZ. **FRENCH** indicated that CHESTANG sells, she sells and Joel LNU by Dairy Queen sells. **FRENCH** stated that she began dealing with NUNEZ around July 2010.

On May 17, 2011, an interview was conducted by Deputy Busby and Deputy O'Shea with Attorney Sid Harrell and Allison Brooke CARTEE. The interview was conducted by asking CARTEE about individuals with whom she is/was associated with, those include: CK, **Chelsie Danielle FRENCH** and Richard Gaona NUNEZ. Deputy Busby had personal knowledge that CARTEE had allowed Richard G. NUNEZ to use her vehicle to go to Atlanta, Georgia the summer of 2010. Allison had been stopped in NUNEZ'S Mitsubishi Spider and told Deputy J. Arata that NUNEZ had taken a four wheeler to Atlanta in her truck. In reference to **French** and NUNEZ; CARTEE had the following information to include: CARTEE stated that she was supposed to be paid an eight (8) ball of "ice" (pure methamphetamine) in exchange for allowing

8

NUNEZ the use of her truck in 2010 to travel to Atlanta, GA. **FRENCH** gave Allison 1 ½ to 2

grams of "ice" prior to NUNEZ'S departure but she never received the remainder.

Deputy Busby asked CARTEE how **FRENCH** was introduced to NUNEZ. CARTEE

stated that B.S. introduced **FRENCH** to NUNEZ; B.S. had met NUNEZ through J. E.. CARTEE

further stated that B.S. and **FRENCH** had a "falling out" because the two had "made a pact" that

neither would go over to NUNEZ'S without the other and **FRENCH** broke the pack around

May/June 2010. **FRENCH** initially went to NUNEZ and had "ice" fronted to her, a half (½)

ounce each time. CARTEE described how **FRENCH** would make fun of NUNEZ because she

would only have $400.00-$500.00 for the "ice" and NUNEZ would still let her, **FRENCH,** have

the half ounce. NUNEZ'S price for a half ounce of "ice" was $800.00. CARTEE indicated that

she had personal knowledge of NUNEZ giving **FRENCH** approximately three (3) ounces of

"ice" overall during the time frame of May/June 2010. The most "ice" (pure methamphetamine)

that CARTEE has personally seen **FRENCH** with, at one time, was close to an ounce in/around

late 2010. CARTEE stated that on or about Friday (May 12, 2011) TMT told CARTEE that

"**FRENCH**" was pretty much running NUNEZ'S operation".

CARTEE stated that around the end of February 2011, Garner Howard CHESTANG (aka

Big Howard) started dealing with **FRENCH** as opposed to NUNEZ. Around the first part of

March 2011, CARTEE went to NUNEZ'S residence to pick up CK because C.K. was drunk and

needed a ride home. C.K. remarked that "Big Howard owed Richard two grand." CARTEE

explained that even though she does not remember "ice" being explicitly mentioned, she is 99%

sure that is what C.K. was talking about. (This would confirm what CHESTANG told CS 1 in a

conversation regarding having to pay his supplier a large amount of money in order to receive more "ice" to sell.)

CARTEE also stated that when VARGAS (aka Chicken) got out of Metro Jail, he VARGUS went back to NUNEZ'S and NUNEZ became nervous. NUNEZ thought that something was wrong because VARGAS did not go back to Louisiana with immigration so NUNEZ would not have anything to do with VARGAS from that point. CARTEE advised that she and **FRENCH** had attempted to bond VARGAS out whenever VARGAS was arrested. They were told that he VARGAS had an immigration hold and would not have a bond.

CARTEE stated at some point during NUNEZ'S operation he moved his stash house for drugs but CARTEE did not know where. Prior to moving the stash house, CARTEE advised that NUNEZ would place the "ice" in a zip lock bag, then wrap it with Saran wrap, dryer sheets, Saran wrap, and then black tape before burying it in his back yard. (This information is consistent with what officers observed at NUNEZ'S residence on May 11, 2011. Officers observed several holes in the back of NUNEZ'S residence where it appeared something had been dug up.)

On July 28, 2011 S/A Fermo, Deputy Legire and Deputy O'Shea interviewed Howard CHESTANG following his arrest on a federal warrant out of the Southern District of Alabama. This interview was in the presence of his attorney Neil Hanley. CHESTANG was arrested for his involvement in a drug smuggling organization involving RICHARD NUNEZ, **Chelsie FRENCH** and others.

S/A Fermo asked CHESTANG to start from the beginning on how he met **FRENCH** and NUNEZ. CHESTANG stated that he met **FRENCH** through CK in December of 2010 or around

10

the first of January 2011. CHESTANG stated that he had known C.K. since she was about (18) eighteen years of age. CHESTANG stated FRENCH and C.K. were always at his house and would come by at least (3) three times a week. CHESTANG stated that **FRENCH** indicated that she lived with a Mexican (later identified as NUNEZ) and that they (**FRENCH** and C.K.) came over at the beginning of this year and smoked "ice" together. CHESTANG stated that **FRENCH** is the one who brought over the "ice" for the first occasion. This was the first time he smoked "ice" with **FRENCH** and C.K. CHESTANG stated that often in the beginning **FRENCH** would come over and stay at his house. CHESTANG stated that in the beginning it bothered NUNEZ that **FRENCH** would stay over at CHESTANG"S. However, one day **FRENCH** brought NUNEZ over to CHESTANG'S house and they started hanging out together. S/A Fermo asked CHESTANG how much drugs had he gotten directly from **FRENCH**. CHESTANG stated that **FRENCH** directly sold him about 5-6 "eight balls" of "ice" referring to 3.5 grams of "ice". CHESTANG further stated that he had distributed over 5-6 ounces of "ice" for NUNEZ over the course of this year and that **FRENCH** was involved in those transactions on behalf of NUNEZ. CHESTANG stated that sometimes **FRENCH** would deliver the ounces of "ice" at the direction of NUNEZ and sometimes he would get it directly from NUNEZ. S/A Fermo asked CHESTANG about the conversation with the source in which he mentioned to the source he owed "his guy" (NUNEZ) money. CHESTANG stated that he owed NUNEZ about $1,5000.00 for drugs that were supplied to him to distribute. S/A Fermo asked how the money was paid for the drugs purchases. CHESTANG stated that sometimes the money would be paid directly to NUNEZ and sometimes he would send **FRENCH** to collect it.

11

S/A Fermo asked CHESTANG to describe the activities that occurred prior to the date of May 11, 2011. CHESTANG stated that about 3-4 weeks before this date NUNEZ came to CHESTANG'S house with a tube about 4 inches in diameter and 12 to 14 inches long. NUNEZ had it wrapped in black tape but showed the contents to CHESTANG. CHESTANG stated that it was completely full of "ice". CHESTANG stated that it was broke down to ounces and based on the size he would estimate it to be about (1) kilogram worth of "ice". CHESTANG indicated that he got a post hole digger and hid it in the ground. CHESTANG stated it stayed there for a week or two, before NUNEZ came over and got it. CHESTANG stated that NUNEZ paid him (1) one ounce of "ice" for hiding it at his house. CHESTANG stated that out of this particular container NUNEZ supplied him on at least 3-4 occasions. CHESTANG stated that at around this time NUNEZ had to travel back to Mexico because his brother was in the hospital. While in Mexico **FRENCH** came over to CHESTANG'S house and called NUNEZ in Mexico. **FRENCH** was accompanied by C.K during this visit. Once **FRENCH** got off the phone she told CHESTANG that NUNEZ told her she could get the container of "ice". CHESTANG dug up the drugs from the ground and gave it to **FRENCH** and C.K.. Right before NUNEZ returned from Mexico, **FRENCH** called CHESTANG and asked him to go over to C.K.'s house and retrieve the container with drugs. CHESTANG stated at first he thought he was being set up, but went over to get it anyway. CHESTANG stated that when he got to C.K.'s house he found the drugs where **FRENCH** had told him. However, it was not in the container anymore and was in a purse. CHESTANG stated that the drugs were just about completely gone. CHESTANG stated he took the drugs and put them back in the ground beside his house. CHESTANG indicated that NUNEZ came to his house the day he returned back from Mexico. NUNEZ got the drugs out of

12

the ground and began to curse **FRENCH** because most of his supply was missing.  CHESTANG stated it appeared that there was only 2-3 ounces of "ice" left.

CHESTANG stated that NUNEZ called both **FRENCH** and C.K. over to the house to explain the missing drugs.  When **FRENCH** and C.K arrived they already had a story made up blaming CHESTANG.  NUNEZ separated everyone and spoke to all three of them separately.  At the end of it NUNEZ handed the drugs to CHESTANG to hide.  CHESTANG stated this made **FRENCH** angry, because she felt NUNEZ was siding with CHESTANG over her.  The next day May 11, 2011, NUNEZ came over to get the "ice" from CHESTANG.  CHESTANG indicated that is what deputies observed happen that morning.  CHESTANG stated that **FRENCH** and C.K. were there around the garage during this time.  NUNEZ placed the drugs in the wench receiver area of his, NUNEZ'S, truck.  **FRENCH** was watching NUNEZ when he hid the drugs and then a heated argument between the two transpired.  They all left CHESTANG'S and a few hours later the confidential source for the government called wanting to buy (1) one ounce of "ice".  CHESTANG stated that a short time after the confidential source called him (CHESTANG) he then called NUNEZ'S cell phone.  NUNEZ answered and CHESTANG ordered up (1) one ounce of "ice".  NUNEZ told CHESTANG he was broke and needed the money, so he told CHESTANG he would sell him (1) one ounce and to come get it.  CHESTANG stated that when he arrived at NUNEZ'S house, NUNEZ was in the yard working on a Toyota car.  NUNEZ handed CHESTANG the drugs and then CHESTANG took NUNEZ'S truck in order to bring back a 4-wheeler.  CHESTANG stated that once he returned to his house he sold the informants the "ice" and then left the house to return the money to NUNEZ.  Shortly

13

after his departure officers stopped, CHESTANG, in NUNEZ'S vehicle. CHESTANG indicated

that the money recovered from the car was the money from the sale of drugs.

CHESTANG stated that a week passed and NUNEZ showed up at CHESTANG'S house.

They both went to down town Mobile to speak with a lawyer. While on the way to the lawyers

office, NUNEZ was on the phone with **FRENCH**. CHESTANG told NUNEZ what happened to

the money already and NUNEZ came up with the story to tell law enforcement the money in the

glove box was from the sale of some truck. CHESTANG stated they bother agreed to this idea

and agreed to stick to this story.

CHESTANG stated the weeks following the seizure of money, NUNEZ would come by

CHESTANG'S house and have a drink with him. NUNEZ would often vent that **FRENCH** had

stole about $9,000.00 worth of "ice" from the container. NUNEZ believed that **FRENCH** used

the money to put a down payment on her SUV.

S/A Fermo asked what C.K.'s role was in the organization. CHESTANG stated that C.K

was mainly a user and just always was around. CHESTANG stated that it was usually **FRENCH**

that did all the selling of "ice" for NUNEZ. CHESTANG stated that **FRENCH** would have it

broke down in to bags of ounces and eight balls. Both girls would keep it in there purse and if

they ever got pulled over they could hide it in there private area of their female body. This way

police could not find it if they stopped them.

CHESTANG stated that it had been over a month since he spoke to NUNEZ.

CHESTANG stated that NUNEZ dropped his phone after police seized the money from the car

on May 11, 2011. CHESTANG stated that NUNEZ had a new number that started with a 251-

408. At this time S/A Fermo showed CHESTANG a photo chart and CHESTANG identified the

14

photo of Richard NUNEZ as his supplier of "ice". CHESTANG also identified **FRENCH**.
CHESTANG then stated that **FRENCH** would often talk about how NUNEZ would go to
Atlanta, Georgia to get the drugs and would drop **FRENCH** off at her parents while he would
pick up a shipment. CHESTANG further stated that on NUNEZ'S last trip to Mexico he left
**FRENCH** with (1) one ounce of "ice" to sale and use while he was gone

 On or about January 31, 2009 a search warrant was executed at 11160 Trace Lane
Wilmer, Alabama. Sleeping in the living room, of the mobile home, were the legal occupants of
the residence to include JE, ES, and **Chelsie Danielle FRENCH**. Items that were located, on the
coffee table, in the living room, included a baggie corner containing approximately three (3)
grams of ICE, rolling papers, marijuana, two glass meth pipes, and several baggies with
suspected meth residue. Also located inside of the residence was a 12 gauge shotgun and
additional drug paraphernalia.

 On or about May 29, 2009, a traffic stop was initiated on a gray 2001 BMW, known to be
driven by **Chelsie Danielle FRENCH**. Also present, in the vehicle, was ES and MH. Deputies
observed a white male, later identified as JM, as he passed items to **FRENCH** and **FRENCH**
then passed items back to JM. As Deputies approached the BMW, **FRENCH** attempted to leave
the parking lot at a high rate of speed. A terry pat was conducted on JM and permission was
given for Deputies to enter his pockets. Two small baggies containing methamphetamine were
removed from JM's pants pocket. A canine was utilized on the BMW with a positive alert
indicated on the driver's side door. A search of the BMW revealed four (4) blister packs of
pseudoephedrine pills, a ball of white material that field tested positive for methamphetamine,
one-hundred (100) loose pseudoephedrine pills for a total of 140 pseudoephedrine pills, three

containers of Drano, and a roll of plastic tubing.  An estimated total of five (5) grams of

methamphetamine was confiscated from the vehicle and from the person of JM.

On or about July 15, 2009 a traffic stop was initiated on a 2004 blue Chevrolet Silverado

pick-up that was registered to Jeremy Travis JORDAN. A call of a stolen dog was made with the

blue truck as the suspect vehicle and two females as the suspects in the theft of the dog.  The

vehicle was located and a traffic stop was initiated. A white female, identified as **Chelsie**

**Danielle FRENCH,** was driving the vehicle and subsequently granted verbal permission for the

vehicle to be searched.  Located in the driver's side map pocket was a clear baggie corner with

methamphetamine and two bonding company receipts for Daniel ONeal NEWBURN.

On or about February 05, 2010 a search warrant was executed at 9041 A Old Mobile

Road Spanish Fort, Alabama.  ABC Agents and Sheriff's Deputies had responded to the residence

attempting to locate and pick up Daniel Oneal NEWBURN on an outstanding felony warrant.

The residence was found to be occupied by Daniel Oneal NEWBURN, **Chelsie Danielle**

**FRENCH,** D.C., and M. P..  Located in the bedroom where **FRENCH** and NEWBURN were

located was methamphetamine, a mirror with methamphetamine, and a glass pipe used to smoke

methamphetamine.  Additional drugs were located in the master bedroom area occupied by D.C.

and M.P..

On or about April 30, 2010, a cooperating witness placed a call to Roy Noyal REED JR.,

to trade pseudoephedrine pills to Reed in exchange for methamphetamine.  Surveillance was set

up around the location where the exchange was to take place.  Prior to the arrival of Reed, a

black 2009 Honda Accord was observed pulling into the parking lot. The vehicle was identified

as being driven by **Chelsie Danielle FRENCH.  FRENCH** parked her vehicle, remained for a

16

few minutes before leaving the parking lot only to return again a short time later. A green Dodge truck was then observed entering the parking lot and REED was identified as the driver. Reed pulled to one end of the parking lot and walked over to the passenger's side window of **FRENCH'S** vehicle. REED and **FRENCH** engaged in a short conversation before REED walked over to the vehicle of the cooperating witness. **FRENCH** backed up and pulled alongside the vehicle of the cooperating witness, placing REED between her vehicle and the vehicle of the cooperating witness. As Deputies approached, REED was observed throwing a clear plastic baggie, containing methamphetamine, towards the front of **FRENCH'S** vehicle. **FRENCH** was asked to exit the vehicle for officer safety and in plain sight a small zippered baggie containing methamphetamine was observed on the driver's seat as **FRENCH** exited the vehicle. This bag of methamphetamine was a second bag of methamphetamine, in addition to the one REED was observed throwing into the vehicle. Revealed in a search of REED'S body, incident to his arrest was a box of 12 hour Equate pseudoephedrine in his pants pocket. An inventory of the green Dodge pickup, driven to the location by REED, revealed marijuana, gram size zippered baggies, digital scales, and four additional pseudoephedrine pills.

On or about September 03, 2010, Deputy J. Arata conducted a traffic stop of a 2009 black Honda Accord for improper backing. The driver of the vehicle was identified as **Chelsie Danielle FRENCH.** Deputy J. Arata advised that **FRENCH** hurriedly exited the vehicle and immediately locked the doors of her vehicle. Deputy J. Arata's requested to search the vehicle due to his knowledge of the area being a known drug area, (i.e., near the home of Richard Gaona NUNEZ), and of **FRENCH** being a known drug user and drug distributor. **FRENCH** refused to give officers consent to search the vehicle. Deputy J. Arata contacted Deputy A. O'Shea who in turn

contacted Deputy J. Houseknecht and his canine partner Nero. A subsequent positive alert by Nero indicated the present of illegal narcotics in the vehicle. **FRENCH** then advised there was indeed ICE in the vehicle and requested that she be allowed to show Deputies where the drugs could be located. A search of the area located between the driver's seat and the center console revealed a zippered baggie containing several smaller clear with blue stars zippered baggies and one small clear with blue stars zippered baggie with approximately .33 grams of ICE.

At the time of the above incident, **Chelsie Danielle FRENCH** was out on bond from her April 20, 2010 arrest for Possession of a Controlled Substance (ICE) and was again arrested for Possession of a Controlled Substance (ICE). This arrest occurred in front of the residence, at the end of the drive way, of **FRENCH'S** boyfriend Richard Gaona NUNEZ.

The defendant conspired with Richard Gaona NUNEZ, and others, to distribute methamphetamine. The United States recommends that the defendant be held accountable for between 350-500 grams of methamphetamine (mixture and substance) for purposes of relevant conduct in this case. The United States also recommends that the defendant receive neither an enhancement or a reduction for role in the offense in accordance with U.S.S.G. §3B1.

Respectfully submitted,

AGREED TO AND SIGNED,

KENYEN R. BROWN
UNITED STATES ATTORNEY

Date: _10/6/11_        _____

GEORGE F. MAY
Assistant United States Attorney

18

Date: Oct. 13, 2011

_____
CHELSIE DANIELLE FRENCH
Defendant

Date: 10·13·11

_____
JAMES M. BYRD
Attorney for Defendant

19